# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
Assigned on Briefs  November 2, 2004

## STATE OF TENNESSEE v. STEVE SKINNER

### Direct Appeal from the Criminal Court for Shelby County
No. 00-05699-005700     Joseph B. Dailey, Judge

---

### No. W2003-00887-CCA-R3-CD  - Filed February 28, 2005

---

The defendant, Steven Skinner, was convicted by jury of two counts of first degree premeditated murder for which he received consecutive sentences of life imprisonment with the possibility of parole.   On appeal, he contends that (1) the evidence is insufficient to sustain his convictions because there is no proof connecting him to the crimes other than uncorroborated accomplice testimony, and (2) the trial court erred in sentencing the defendant to two consecutive life sentences. Upon review of the record and the parties' briefs, we affirm the judgments of the trial court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed

J.C. McLin, J., delivered the opinion of the court, in which Jerry L. Smith and Robert W. Wedemeyer, JJ., joined.

Charles E. Waldman, Memphis, Tennessee, for the appellant, Steve Skinner.

Paul G. Summers, Attorney General and Reporter; J. Ross Dyer, Assistant Attorney General; Williams L. Gibbons, District Attorney General; Robert Carter, and Jennifer Nichols, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION

### I. Proof at Trial

The defendant, Steven Skinner, was convicted by jury of first degree premeditated  murder of Sid Towns and Omar Stokes.  Proof presented at trial established that Towns and Stokes drove to Houston, Texas with approximately $53,000 to purchase drugs for Marcus Boyd, Calvin Wardlow, and the defendant – members of a Memphis gang known as the Gangster Disciples.  Upon arrival, Towns and Stokes were tricked into delivering the money to Lanail Allen, an acquaintance of Stokes.  Previously, Allen had told Stokes that he knew of a cocaine supplier who would sell Stokes a large quantity of cocaine.  However, unknown to Stokes or Towns, Allen was not in contact with any cocaine supplier but planned to steal the money under the pretense of conducting a drug

transaction. After some negotiation, Allen asked Towns to drive him to an apartment complex to complete the transaction. Allen directed Towns to drop him off and took the money into the apartment complex to meet the fictitious supplier while Towns waited in his Suburban outside. Allen never returned from the building.

Realizing that Allen had "stung them out of the money" Towns and Stokes attempted to find Allen and get the money back. However, they quickly gave up, realizing that they would never find Allen in Houston. Towns then called Marcus Boyd and told him what happened. After making several phone calls, Towns and Stokes decided to leave Houston and drove back to Memphis. On Saturday, March 13, 1999, in the early morning hours, Towns and Stokes were shot and killed outside an auto-body shop owned and operated by Towns.

William Ware, a neighbor living across the street from the auto-body shop, awoke to the sound of gunshots fired. Peaking out of his window, Ware saw two men get into a white car and drive off. Ware called the police to report what he heard and observed.

Around 6:00 a.m., Police Officer Moulty responded to a dispatch call advising him of shots fired in his area of patrol. While en route, Officer Moulty noticed two men crossing an intersection and decided to stop them and ask a few questions. Upon asking the two men to come over to his police cruiser, the two men bolted and ran. Officer Moulty chased after them and eventually apprehended one of them, Michael Brown. After searching Brown, Officer Moulty discovered a Smith and Wesson 659 in a holster strapped to the small of Brown's back. Officer Moulty noted that the gun was completely empty of bullets. The gun was inventoried and later identified as one of the guns used to shoot Towns and Stokes.

At the crime scene, police officers identified the bodies of Towns and Stokes. From the crime scene, officers retrieved several spent shell casings, bullet fragments, and a black baseball cap. The officers thoroughly documented the crime scene, taking over 100 photographs of the location and position of the evidence found at the scene. Some of the shell casings and bullet fragments were later identified as those fired from a Smith and Wesson 659, nine-millimeter semi-automatic handgun. An autopsy revealed that both Towns and Stokes died from multiple gun shot wounds.

## A. Accomplice testimony

### 1. *Michael Brown*

Two witnesses identified by the court as accomplices testified for the prosecution about the events surrounding the murder of Towns and Stokes. The first, Michael Brown, testified that he had shot and killed Towns and Stokes and was currently serving life sentences in federal prison for those murders. He was testifying against the defendant in exchange for the dismissal of the murder charges pending in state court. According to Brown, he had been a member of Gangster Disciples since age twelve and his rank within the gang was Chief of Security. On March 13, around 3:00 a.m., Brown received a call from Marcus Boyd and the defendant. During the conversation, Brown

was told to get some guns. After meeting with Calvin Boyd, he and Calvin Boyd retrieved two nine-millimeter guns, clips, and ammunition from Boyd's grandfather's house, and waited to be picked up by Marcus Boyd. Later, Calvin Boyd and Brown were picked up by Marcus Boyd who was driving his Lexus truck. Wardlow and the defendant were also present in the truck. Marcus Boyd then drove the truck to a house on Modder Street. Upon arrival, Brown got out of the truck, went into the house and woke up Jason Coleman. After arriving at the house, Brown began cleaning and loading the guns. While in the house, Brown overheard Marcus Boyd make the statement "Whack them." Then Brown heard the defendant respond, stating "[w]hack them . . . Make sure don't nobody move. Make sure both of them dead." In agreement, Wardlow reiterated the defendant's statement to make sure both Towns and Stokes were dead. According to Brown, the plan was to have him and Calvin Boyd do the shooting.

Brown testified that after a brief discussion, he, Marcus Boyd, Calvin Boyd, Wardlow, and the defendant, went to find a second car to use in the killing of Towns and Stokes. While driving around, the group came across Kevin Harris and Robert Taylor who had just stolen a white Chrysler Sebring. Marcus Boyd paid for the stolen Sebring, and Wardlow drove it back to the house on Modder Street. Upon arriving at the house, the defendant told Brown that "he wanted us to kill 'em put 'em in the trunk, and take 'em to the expressway." In response, Brown told the defendant that the plan would take too much time and be too dangerous. Thereafter, Wardlow suggested that the group, "get them at the body shop," and this plan was agreed upon.

According to Brown, the group then split up and left the house on Modder Street. The defendant, Marcus Boyd, and Wardlow left in the Lexus truck, driven by Marcus Boyd. Brown, Calvin Boyd, and Coleman left in the stolen Sebring. Previously, Brown had woke Coleman up and told him to "ask no questions. Just get up and come drive the car." Brown then gave Coleman directions to the auto-body shop. After reaching the shop, Brown and Calvin Boyd hid on each side of the building and waited. Coleman drove the car across the street and waited. Once situated, Brown heard a Suburban pull up and then saw the Lexus truck pull up to the front of the body shop. Brown observed Marcus Boyd and Wardlow get out of the truck and go inside the shop while the defendant remained inside the truck. Once Marcus Boyd and Wardlow entered the building, the defendant exited the truck. As the defendant got out of the truck, his designer hat fell off in the parking lot.[1] After approaching Brown and Calvin Boyd, the defendant instructed them to take action when they were signaled by a flash of the Lexus truck lights. According to Brown, the defendant gave the instructions and stated "Fuck what Marcus and Wardlow say, I'm asking you – I'm telling you to do this, and when I flash the lights, I want you to do it." Upon making this statement, the defendant made a gesture indicating to Brown that doing this would get him "a little taste of money." After waiting for about forty-five minutes, Marcus Boyd and Wardlow exited the building. Brown saw Marcus Boyd give a signal which meant "[d]on't worry about it. Leave." However, shortly after Marcus Boyd's signal, Brown saw the lights flash, whereupon he and Calvin

---

[1] According to Brown's testimony the designer hat, found at the crime scene, had been worn by the defendant earlier in the evening before the murder of Towns and Stokes took place. The hat was entered into evidence as Exhibit 8.

Boyd shot both Towns and Stokes about "twenty-five" times. Brown blamed the defendant for flashing the lights, and stated that if he had not seen the flashing lights, he would not have shot Towns and Stokes. Brown testified that he was arrested by the police later that morning while trying to escape.

On cross-examination, Brown admitted that on March 13, 1999, he was highly intoxicated from drinking alcohol, smoking marijuana, and cocaine, but maintained that he was alert as to the events that led up to the murder of Towns and Stokes. Also, Brown indicated that Marcus Boyd was considered high rank in the Gangster Disciples and outranked the defendant. However, Brown insisted that Marcus Boyd chose not to be in charge the night of the murders. Additional inconsistencies concerning Coleman's involvement were also brought to light during the defense counsel's cross-examination of Brown. Brown stated that he believed that Coleman was "affiliated with the Gangster Disciples." Moreover, Brown could not explain why he told the police in March of 1999 that Coleman met the group at Vaal Street, but now testified that Coleman was awaken from sleep at the house on Modder Street.

Responses to cross-examination questions revealed that Brown's testimony regarding the defendant's involvement in the murder was inconsistent with previous written statements made to police after his arrest. Brown admitted that in his March 13th statement to police, he did not implicate Wardlow in the murders because at the time the information had slipped his mind. Brown also admitted that his March 13th statement implicated Marcus Boyd as the person who asked for the killing of Stokes and Towns not the defendant. Brown further admitted that his testimony regarding the defendant's exit of the Lexus truck to give Brown information about the signal, and statement "Fuck what Marcus and Wardlow say, I'm asking you – I'm telling you to do this, and when I flash the lights, I want you to do it" was not indicated in either of his previous statements to the police. Rather, Brown conceded that in his March 13th statement, he told the police that before "[the defendant] and Marcus Boyd pulled up, they flashed the lights three times for me and Calvin to come from on this side of the building and kill Omar Stokes and Sid Towns, and that's what we did."

During cross-examination, Brown acknowledged that he did not actually know when the defendant lost his hat, but speculated that it fell off as the defendant was getting out of the truck. Although Brown agreed with the defense counsel that his memory was "a lot clearer on these events three years ago," Brown continued to assert that he simply did not remember every detail of the events surrounding the murders at the time he made those statements, and that some of the facts he swore to in the statements were not true, but told to the police in haste to "get the heat off."

On re-direct Brown insisted that his testimony was not inconsistent but rather he was testifying to certain things not asked during the course of giving the statements to the police. Brown also pointed to his statement on March 15, 1999 where he indicated that the defendant gave the signal. Brown contended that his testimony was truthful and emphasized that had the lights not flashed he would not have killed Towns and Stokes. On re-cross examination, it was emphasized that Brown also admitted that he told the police taking his statement that "Marcus and Carlos [got]

-4-

into the truck with Steve and gave us the signal." However, Brown asserted that this statement was not correct because he saw "the lights [flash] before Marcus [Boyd] got in the driver's seat."

## 2. *Carlos Wardlow*

Carlos Wardlow, the second accomplice, testified that he had recently entered a plea agreement to serve twenty years in the federal system for his involvement in the murder of Towns and Stokes. As part of the plea agreement, Wardlow agreed to testify against the defendant in exchange for the dismissal of similar charges pending in state court. According to Wardlow, he, Brown, Marcus Boyd, Calvin Boyd, and the defendant were all members of the Gangster Disciples. Omar Stokes, one of the victims, was also a member.

Wardlow explained how each member ranked within the Gangster Disciple organization. Marcus Boyd's designated position was "Overseer," which gave him control over almost all other Gangster Disciples in Memphis. Wardlow, himself, was a "Governor" and controlled South Memphis. The defendant was an "Assistant Governor" and supervised part of South Memphis. Brown acted as "Chief of Security" for the South Memphis area, and Calvin Boyd worked with Brown as part of security.

Wardlow testified that he, Marcus Boyd, and the defendant were involved in dealing drugs. Marcus Boyd was responsible for purchasing the drugs while Wardlow and the defendant were responsible for distribution. As partners, the profits from the sale of the drugs were split equally. In late 1998, the three partners were forced to look for new suppliers because their previous suppliers had been arrested and incarcerated. Consequently, the three partners approached Omar Stokes and Sid Towns and requested help in finding new drug suppliers. It was Stokes responsibility to find and make the connections with the drug suppliers, and it was Towns responsibility to transport the drugs in his Suburban. On or about March 10, 1999, Marcus Boyd went to Town's home and dropped off a large quantity of money in a brown paper bag. It was understood that Towns and Stokes were to go to Chicago to purchase a large quantity of drugs for Marcus Boyd, Wardlow, and the defendant.

Wardlow testified that on March 12, 1999, around 9:00 p.m., he, Marcus Boyd, Calvin Boyd, Coleman, and a few others were hanging out making rap music when Marcus Boyd received a call on this cell phone. Wardlow observed that the phone call agitated Marcus Boyd. After hanging out for a while, Wardlow left and went to his grandmother's house. About 40 minutes later, Wardlow received a call from Marcus Boyd telling him to come out of the house and take a ride with him in his Lexus truck. After picking Wardlow up, Marcus Boyd went to pick up the defendant. Once the defendant was picked up, Marcus Boyd told Wardlow and the defendant that Towns and Stokes had lost their money in Texas.

Wardlow testified that all three partners were angry with Towns and Stokes for losing their money. Consequently, all three partners "came to the conclusion that [Towns and Stokes] would have to be killed for the money that was missing." According to Wardlow, the initial plan was to kill

Towns and Stokes "right after they got off the highway and come back into town." Wardlow explained:

> Skinner [the defendant] had agreed to kill them, and while we was riding around, we was looking for a location to kill them at, and Marcus, Skinner, and myself came to the conclusion that Skinner would do it at a gas station at Mallory and Third Street. [However,] at that time, Skinner said that he didn't think that would be a good place to kill them at.
> . . .
> The next idea came from Marcus. Marcus said that he didn't want Steven Skinner to do it; that he would have somebody else do it. And we rode around and he came to the conclusion that he would have Calvin Boyd and Michael Brown kill 'em. . . . Michael Brown and Calvin Boyd, they were supposed to go and hide behind the custom shop that Sid [Towns] owns.

Wardlow then related how the new plan to kill Towns and Stokes came to fruition. After picking up Brown and Calvin Boyd, the group came upon two men, who were known to be car thieves, stripping a stolen car. After paying for the stolen car, Marcus Boyd told him to drive the car to the house on Modder Street where Coleman was sleeping. Upon arrival, Wardlow got out of the car and followed Marcus Boyd into the house where he observed Marcus Boyd wake Coleman up. According to Wardlow, after waking Coleman up, Marcus Boyd asked Coleman to drive Brown and Calvin Boyd to the auto-body shop. After Coleman, Brown and Calvin Boyd left, Wardlow, Marcus Boyd and the defendant drove to Sid Town's house to speak with him about the lost money. The three of them then had a conversation with Towns. During the conversation, Towns blamed Stokes for choosing to go to Texas instead of Chicago and losing the money. Marcus Boyd responded to Town's statement by telling Towns to bring Stokes to the auto-body shop. Although Towns objected to bringing Stokes to his shop, the defendant gave Towns an ultimatum stating, "[e]ither you bring him to the shop, or we're gonna kill both of you all." Towns agreed to bring Stokes to the shop.

While en route to the auto-body shop, Wardlow tried to talk Marcus Boyd out of killing Towns and Stokes that night because he thought the police would check Marcus Boyd's telephone records. According to Wardlow, the defendant later voiced his disagreement with Wardlow's earlier advice, and stated that "they should be killed." However, as they pulled up to the auto body shop, Marcus agreed with Wardlow that he was right about the phone records. Therefore, upon arrival at the auto-body shop, Wardlow let the window down and yelled out to where he believed Brown and Calvin Boyd were hiding, telling them not to kill Towns and Stokes and that the hit was off. Moments later, Towns and Stokes arrived in the Suburban.

According to Wardlow, the defendant stayed in the back seat of the Lexus truck while he Marcus, Towns and Stokes entered into the body shop. Once inside, Wardlow and Marcus Boyd questioned Stokes as to what happened to the money, and what he planned to do to get the money back. Stokes insisted that his hookup betrayed him, and had walked off with the money. After this conversation, all four men walked out of the building and headed for their vehicles. Wardlow

explained that he and the others were walking out the door to the body shop when he saw "the high beams on the Lexus flash on and off/on and off/on and off." That is when he saw Calvin Boyd sneaking up behind Stokes. Calvin Boyd had a ski mask covering his face and was armed. Immediately, Wardlow ran to the Lexus Truck and got into the front passenger side. At the same time, Marcus Boyd had reached the truck and got into the driver's seat. As Wardlow got into the truck, he observed the defendant sitting in the back of the truck. Wardlow stated that he heard a lot of gunshots as the three partners left the driveway of the auto-body shop.

After fleeing the scene, the defendant said, "Man, I dropped my hat outside – outside the truck." Wardlow responded, "Turn around, let's go back and get his hat." However, Marcus Boyd told Wardlow to "forget the hat." The group then headed to Nashville. A couple hours later, Calvin Boyd and Coleman met up with them at Marcus Boyd's house in Nashville. According to Wardlow, the defendant was the only individual that did not appear upset about the "hit" that just took place. Rather, the defendant was "very hyperactive." In fact, Wardlow heard the defendant make the statement "[t]hem niggers . . . got what they had coming to them." Wardlow also said that the defendant told the group that "Calvin was holding his composure better than he did on his first killing." After spending a few hours in Nashville, Wardlow, the defendant, and Marcus Boyd drove back to Memphis.

On cross-examination, Wardlow admitted that in addition to having all state criminal charges dismissed, he could potentially receive a reduced federal sentence if he cooperated with the State and testified against the defendant. Wardlow also explained why Towns and Stokes were asked to find additional drug suppliers. Omar Stokes was believed to be a board member of the Gangster Disciples in Chicago. Chicago was the world headquarters of the Gangster Disciples. Therefore, Stoke's status as a board member of the Chicago Gangster Disciples demanded respect. Sid Towns had outfitted his Suburban with a special secret compartment in order to transport drugs back to Memphis. As owner of the Suburban, Towns was designated as the driver in charge of the drug transportation. However, Towns and Stokes were supposed to go to Chicago not Texas to pick up cocaine. When the three partners learned that Towns and Stokes lost their money they became angry and upset. They believed they had been "ripped off" and disrespected by Stokes.

Wardlow acknowledged during cross-examination that he was not sure where Brown and Calvin Boyd were hiding when he shouted out the window that the hit was off. Moreover, he admitted that he did not get out of the car to make sure that Brown and Calvin Boyd heard him. As Wardlow explained, he did not have time to personally relate the message because the Suburban had pulled into the parking lot and he did not want to indicate to Stokes that a "hit" had been planned. However, Wardlow testified that when he yelled out the window, the defendant did not object to him calling the hit off. In fact, Wardlow stated that he believed he was speaking for everybody in the truck when he shouted out the window.

Additional responses to cross-examination questions revealed that although Wardlow saw the Lexus truck lights flash, it meant nothing to him. Wardlow emphasized that he did not know of any

discussion involving any signal whatsoever. Wardlow also reiterated that the defendant did not get out of the Lexus truck or go into the building with him and Marcus Boyd.

## B. Other Witnesses

### 1. *Jason Coleman*

Jason Coleman testified for the prosecution. Coleman denied being a member of the Gangster's Disciples. Coleman explained that he had met Marcus Boyd while playing basketball on the campus of Tennessee State University. At the time, Coleman was nineteen years old, living in Nashville, and attending TSU. Because of similar interests in the rap music industry and basketball, Coleman became friends with Marcus Boyd. Although friends, Coleman did not know that Marcus Boyd was a gang member.

March of 1999, Coleman was out for spring break and traveled to Memphis on Thursday, March 11 in order to see his girlfriend and her family. After spending the night at his girlfriend's house, Coleman went to a community center to play basketball. After playing basketball until 8:00 p.m., Coleman was unable to convince his girlfriend to pick him up because he was in a bad neighborhood and it was late. As a result, Coleman walked to Marcus Boyd's grandfather's house. There, Coleman met up with Marcus Boyd. Coleman asked Marcus Boyd to drive him to his girlfriend's house, however, Marcus Boyd did not want to drive that far and instead dropped Coleman off at the house on Modder Street were Coleman ended up sleeping.

According to Coleman he was woken up by Marcus Boyd early Saturday morning. Marcus Boyd shook Coleman and said, "[g]et your ass up . . . These mother-fuckers took my money. Get your ass up." Still sleepy, Coleman heard Marcus Boyd say "I need you to drop them off." Because Brown and Calvin Boyd were standing behind Marcus Boyd in the bedroom, Coleman understood that Marcus Boyd wanted him to drop them off. Coleman did not argue with Marcus Boyd because Marcus Boyd had never put him in jeopardy, nor done anything "terribly wrong" in the past. Coleman emphasized that he had no idea what was going on or what was about to happen.

After getting dressed, Coleman went outside to the driveway where he observed the Lexus truck and a white Sebring. Although Coleman did not want to drive, Brown told him to drive and drop them off at an unspecified location. Coleman did not argue, got into the driver's seat, and drove the Sebring. Although Coleman was not told what the destination was, Brown gave him directions until they reached a building. Coleman was directed to park the car behind the building. As Brown and Calvin Boyd exited the Sebring, Brown told Coleman to wait because they would be right back. Coleman stated that he did not know Brown or Calvin Boyd were carrying guns because he had not seen them.

As Coleman waited in the Sebring, he saw the Lexus truck and a Suburban drive past and park in front of the building. Seeing the vehicles, Coleman got out of the Sebring and watched Marcus Boyd and Wardlow exit the Lexus truck, and two other men exit the Suburban. All four men

then entered the building. Brown and Calvin Boyd were nowhere to be seen. In an effort to find Brown and Calvin Boyd, Coleman walked around the building calling their names. However, no one appeared. Again, Coleman called out for Brown and Calvin Boyd to show themselves but no one responded, and Coleman, not seeing anybody, went back to the Sebring.

After sitting in the Sebring for about ten minutes, Coleman exited the car and walked to a building overhang and stood there watching the front of the building. From the overhang, Coleman was able to observe Wardlow exit the building along with the two other men. However, Coleman did not see Marcus Boyd leave the building. As Coleman explained, he was now able to identify one of the men as Sid Towns, whom he had previously met at a wedding in Memphis. As Coleman watched Towns and the other man leave the building, he saw a shadow step behind one of the men and heard gunshots fired. Hearing "non-stop gunfire," Coleman ran back to the car.

According to Coleman, he reached the Sebring about the same time Brown and Calvin Boyd did. Once in the car, Brown again told Coleman to drive. However, after making a few turns, the car died. Coleman testified that when the car stalled, he did not try to park it but jumped out of the car and took off running. Coleman continued to run and hide until he reached Marcus Boyd's grandfather's house and called Marcus Boyd. Marcus Boyd told Coleman to wait at the house where he would be picked up.

Coleman stated that he was eventually picked up by Calvin Boyd and two girls and taken to Nashville. Once in Nashville, Coleman and Calvin Boyd met up with Marcus Boyd, Wardlow, and the defendant at Marcus Boyd's home. According to Coleman, the defendant appeared happy about what just took place while everyone else looked worried or scared. As Coleman explained, no one was talking because they had all learned that Brown had been caught by police. However, the defendant asked Calvin Boyd to show everyone how he shot Towns and Stokes. Whereupon, Calvin Boyd demonstrated for the group how he shot the two men. After watching the demonstration, the defendant also made the statement "[w]e whacked them – we whacked them. We killed them mother-fuckers. They got what they deserved. We whacked them. We're gonna hurt the town with this." Later, as the group prepared to leave and drive back to Memphis, Coleman heard the defendant telling Marcus Boyd to get an alibi worked out. Six months later, Coleman was apprehended as a suspect in the murders and was interviewed by law enforcement.

On cross-examination, Coleman reiterated that it was Marcus Boyd who woke him up and asked him to drive the stolen Sebring. Coleman underscored the fact that Marcus Boyd, Wardlow, and the defendant got into the Lexus Truck and left the house while he drove Brown and Calvin Boyd in the Sebring. Coleman also indicated that he had observed the defendant sitting in the back seat of the Lexus truck.

Also emphasized on cross-examination was the fact that Coleman did not know what the group was planning to do. Though Coleman admitted that he realized the Sebring was stolen while waiting for Brown and Calvin Boyd to return. However, being in an unfamiliar part of Memphis, Coleman stated that he was uncomfortable leaving. Coleman also asserted that he was in a good

position to see the front door of the building. Yet, he admitted that he did not see any flash of light before hearing the gunfire. Finally, Coleman stated the fact that he saw Wardlow get into the passenger side of the Lexus truck.

## 2. *Randall Jackson*

As a witness for the prosecution, Randall Jackson testified that he was a friend of the defendant, and that sometime in March of 1999, the defendant offered him $10,000 to take care of some business. According to Jackson, the defendant wanted Jackson to take care of some business because a Gangster Disciple took money from him. However, the defendant was not specific as to what business he wanted taken care of. Jackson testified that later on during the day, the defendant told Jackson that he wanted "somebody to kill some folks." At this time, Jackson, Wardlow, and defendant were in the defendant's car, heading to meet Marcus Boyd. After meeting at the rendevous point, everyone got into Marcus Boyd's Lexus truck whereupon the defendant told Marcus Boyd "[t]he bitch won't fuck." Jackson testified that he believed the defendant's statement was in reference to his refusal to take care of business for the defendant.

On cross-examination, Jackson admitted that he gave a statement concerning his conversation with the defendant to the police on May 21, 1999. At the time, Jackson was in custody for federal criminal charges unrelated to the murder of Stokes and Towns. The statement was given after Jackson had pled guilty to the charges but before he was sentenced. Although Jackson admitted that his felony charges were reduced at the sentencing hearing, he denied mentioning the statement at any time during his sentencing in an effort to reduce his sentence. Jackson also admitted that he was currently in custody facing pending charges. However, Jackson asserted that no promises had been offered for testifying at the defendant's trial.

Responses to cross-examination questions indicated that Jackson gave a statement concerning his conversation with the defendant to detectives three months after the murder of Towns and Stokes. Also, contradicting earlier testimony, Jackson stated that the conversation between him and the defendant occurred in late April or early May not in March. Jackson also admitted that his May 21 statement indicated that the conversation with the defendant occurred on Thursday afternoon before Towns and Stokes were killed. Moreover, Jackson acknowledged that his May 21 statement did not contain any reference to the defendant's statement "[t]he bitch won't fuck." Finally, Jackson acknowledged that he had heard that Towns and Stokes had been killed from the reports on television and news from the street.

On re-direct examination, Jackson emphasized that his May 21 statement corroborated the fact that the defendant offered him money to take care of some business, the defendant and Marcus Boyd wanted to kill a guy who was a Gangster Disciple, and this related to some money that the Gangster Disciple had taken from them. Jackson averred that his May 21 statement was true.

-10-

The defendant chose not to put on any proof at trial. At the conclusion of the trial, the jury convicted the defendant of two counts of first degree murder. At the sentencing hearing, the trial court ordered the defendant to serve his two life sentences consecutively.

## II. Analysis: Sufficiency of the Evidence

On appeal, the defendant argues that the evidence is insufficient to sustain his convictions because there is no proof connecting him to the murders other than uncorroborated accomplice testimony. Specifically, the defendant argues that (1) Jason Coleman was an accomplice as a matter of law, and therefore, his testimony required corroboration; and (2) the State failed to provide sufficient evidence to corroborate the accomplice testimony. The State argues that the evidence is sufficient to support the convictions because (1) Jason Coleman was not an accomplice and his testimony corroborates the accomplice testimony and (2) the accomplice testimony was sufficiently corroborated by independent evidence.

Our review on appeal begins with the well-established rule that once a jury finds a defendant guilty, his or her presumption of innocence is removed and replaced with a presumption of guilt. State v. Black, 815 S.W.2d 166, 175 (Tenn. 1991). Therefore, on appeal, the convicted defendant has the burden of demonstrating to this Court why the evidence will not support the jury's verdict. State v. Carruthers, 35 S.W.3d 516, 557–58 (Tenn. 2000); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). To meet this burden, the defendant must establish that no "reasonable trier of fact" could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319 (1979); State v. Evans, 108 S.W.3d 231, 236 (Tenn. 2003); Tenn. R. App. P. 13(e).

In contrast, the jury's verdict approved by the trial judge accredits the States' witnesses and resolves all conflicts in favor of the State. State v. Harris, 839 S.W.2d 54, 75 (Tenn. 1992); State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984). The State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be from that evidence. State v. Carruthers, 35 S.W.3d 516, 557–58 (Tenn. 2000); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). Questions concerning the credibility of the witnesses, conflicts in trial testimony, the weight and value to be given the evidence, and all factual issues raised by the evidence are resolved by the trier of fact and not this Court. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). We do not attempt to re-weigh or re-evaluate the evidence, nor do we substitute our inferences drawn from the circumstantial evidence for those drawn by the trier of fact. State v. Elkins, 102 S.W.3d 581, 582 (Tenn. 2003); State v. Reid, 91 S.W.3d 247, 277 (Tenn. 2002); State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

### A. Accomplice Status

In Tennessee, a conviction may not be based solely upon the uncorroborated testimony of an accomplice. State v. Bane, 57 S.W.3d 411, 419 (Tenn. 2001); State v. Shaw, 37 S.W.3d 900, 903 (Tenn. 2001) (citations omitted). Furthermore, accomplices cannot corroborate each other. State

v. Boxley, 76 S.W.3d 381, 386 (Tenn. Crim. App. 2001). "An accomplice is one who knowingly, voluntarily, and with common intent unites with the principal offender in the commission of a crime." State v. Allen, 976 S.W.2d 661, 666 (Tenn. Crim. App. 1997). Typically, the test for determining whether a witness is an accomplice is whether he himself could have been convicted for the offense. Id; State v. Lawson, 794 S.W.2d 363, 369 (Tenn. Crim. App. 1990).

The question of who determines whether a witness is an accomplice depends upon the evidence introduced during the course of a trial. Bethany v. State, 565 S.W.2d 900, 903 (Tenn. Crim. App. 1978). When the undisputed evidence clearly establishes the witness is an accomplice as a matter of law, the trial court, not the jury, must decide this issue. State v. Lawson, 794 S.W.2d 363, 369 (Tenn. Crim. App. 1990). On the other hand, if the evidence adduced at trial is unclear, conflicts, or subject to different inferences, the jury, as the trier of fact, is to decide if the witness is an accomplice. Id. If the jury finds accomplice status, then the issue of whether the witness's testimony has been sufficiently corroborated becomes a matter entrusted to the jury as the trier of fact. State v. Bigbee, 885 S.W.2d 797, 803 (Tenn. 1994).

Initially the record reflects that the trial court, through its charge, identified witnesses Michael Brown and Carlos Wardlow as accomplices to the crimes. The trial court then defined accomplice status and instructed the jury to consider accomplice testimony only if the testimony was supported and corroborated by independent evidence. Although Brown and Wardlow were recognized as accomplices in the jury instructions, Jason Coleman was not. Nonetheless, the jury instructions were accurate and complete on the issue of accomplice testimony and how it should be weighed. From the record, we cannot find any evidence where the defendant requested that the jury instructions include Coleman as an accomplice. Absent such a request for accomplice instruction, the issue is waived on appeal. State v. Robinson, 146 S.W.3d 469, 489 (Tenn. 2004); See State v. Anderson, 985 S.W.2d 9, 17 (Tenn. Crim. App. 1997) ("omissions in the jury charge must be called to the trial judge's attention or be regarded as waived.") (citations omitted).

Additionally, and perhaps more importantly, the record does not support the defendant's contention that Jason Coleman was an accomplice as a matter of law. Coleman's testimony regarding his involvement clearly places his accomplice status in dispute. Although Coleman's testimony indicates that he was in close proximity to the perpetration of the murders, his testimony also suggests that he did not knowingly, voluntarily, and with common intent unite with the principal offenders to commit the crimes. Whatever evidence implicating Coleman as an accomplice conflicts with evidence indicating his ignorance and innocence of the events surrounding the criminal acts. For example, Coleman's testimony indicates that he unwittingly complied with Marcus Boyd's request to drive Brown and Calvin Boyd to some unknown location. His testimony also reveals that he was never apprised of the plan to kill Towns and Stokes. The evidence simply does not establish that Coleman was an accomplice to the murders of Towns and Stokes. As such, the issue of whether Coleman was an accomplice was a factual question to be determined by the jury and it was within their province to either credit or discredit his testimony. Accordingly, the defendant's argument that Coleman was an accomplice as a matter of law is without merit.

## B. Corroboration of Accomplice Testimony

Our supreme court has held that in order to properly corroborate accomplice testimony

[t]here must be some fact testified to, entirely independent of the accomplice's testimony, which, taken by itself, leads to the inference, not only that a crime has been committed, but also that the defendant is implicated in it; and this independent corroborative testimony must also include some fact establishing the defendant's identity. This corroborative evidence may be direct or entirely circumstantial, and it need not be adequate, in and of itself, to support a conviction; it is sufficient to meet the requirements of the rule if it fairly and legitimately tends to connect the defendant with the commission of the crime charged. It is not necessary that the corroboration extend to every part of the accomplice's [testimony].

Shaw, 37 S.W.3d at 903 (quoting Bigbee, 885 S.W.2d at 803). Furthermore, independent evidence, though slight and entitled to little weight when standing alone, is sufficient to corroborate accomplice testimony. State v. Heflin, 15 S.W.3d 519, 524 (Tenn. Crim. App. 1999). However, evidence that merely casts suspicion on the accused is inadequate to corroborate an accomplice's testimony. Boxley, 76 S.W.3d at 387 (citations omitted). The sufficiency of the corroboration is a determination for the jury. Shaw, 37 S.W.3d at 903.

From our review of the record, we note that both accomplices, Brown and Wardlow, testified that the defendant played an integral part in planning and ordering the murder of Towns and Stokes. Brown's testimony indicated that the defendant participated in the murders by telling him and the other gunman to shoot when signaled by the flash of the Lexus truck headlights. Wardlow's testimony revealed that the defendant had a motive to kill Towns and Stokes. As a partner in the drug trafficking business, the defendant lost money when Towns and Stokes lost the partners' drug money. According to Wardlow, the defendant convinced Towns to bring Stokes to the auto-body shop by intimidating him with a death threat. Wardlow's testimony also indicated the defendant's attitude and demeanor before and after the murders.

As corroborative evidence, Jason Coleman's testimony indicates that early Saturday morning, Towns and Stokes were shot. In addition, Coleman testified that he overheard the defendant make the statements "[w]e killed them mother-fuckers. They got what they deserved. We wacked them We're gonna hurt the town with this." Coleman further related that the defendant appeared happy that the murders had taken place. Thus, Coleman's testimony corroborates the accomplice testimony with regard to the fact that Towns and Stokes were murdered and connects the defendant to the crimes committed.

Randall Jackson's testimony also implicates the defendant in the murder of Towns and Stokes. Jackson's testimony indicates that the defendant offered to give him $10,000 to take care of business for him. According to Jackson, the defendant then mentioned that a Gangster Disciple

took some money from him. Jackson related that he believed the defendant offered him the $10,000 because the defendant wanted him to kill somebody.

Beyond the testimony of Coleman and Jackson, the State introduced a black designer baseball hat into evidence. The hat was found at the crime scene and further corroborates the accomplice testimony. Both accomplices testified to the fact that the defendant was wearing a black designer baseball hat the morning of the murders. Brown testified that the defendant's hat fell off in the parking lot as the defendant got out of the truck. According to Brown, the defendant had left the truck to instruct him and Calvin Boyd on what do when they saw the Lexus truck lights flash. Wardlow testified that while fleeing the crime scene, the defendant acknowledged the fact that he had dropped his hat outside.

As previously stated, evidence independent of accomplice testimony, though slight and circumstantial, is sufficient to corroborate accomplice testimony. Consequently, after reviewing the record, we conclude that sufficient corroborative evidence exists to uphold the defendant's convictions.

### C. Overall Sufficiency of the Evidence

In the present case, the defendant was convicted of two counts of first degree murder. First degree murder is defined in pertinent part as the "premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1). 'Intentional' refers to a person who acts intentionally with respect to the nature of the conduct or to a result of the conduct when it is the person's conscious objective or desire to engage in the conduct or cause the result." Tenn. Code Ann. § 39-11-302 (a). Premeditation refers to "an act done after the exercise of reflection and judgment." Tenn. Code Ann. § 39-13-202(d). Moreover, premeditation "means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time." Tenn. Code Ann. § 39-13-202(d).

The jury in this case was not only instructed on the elements of first degree murder and lessor included offenses, but also on the theory of criminal responsibility for the conduct of another. "A person is criminally responsible as a party to an offense if the offense is committed by the person's own conduct, by the conduct of another for which the person is criminally responsible, or by both." Tenn. Code Ann. § 39-11-401(a). One is criminally responsible for an offense committed by another when, "[acting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense." Tenn. Code Ann. § 40-11-402(2). Criminal responsibility is not a separate crime but "solely a theory by which the State may prove the defendant's guilt of the alleged offense, . . . based upon the conduct of another person." State v. Dickens, 123 S.W.3d 355, 389-90 (Tenn. Crim. App. 2003) (quoting State v. Lummoxes, 996 S.W.2d 166, 170 (Tenn.1999)). Under a theory of criminal responsibility, an individual's presence and companionship with the perpetrator of a felony before and after the commission of an offense are circumstances from which his or her participation in the crime may be inferred. See State v. Ball, 973 S.W.2d 288, 293 (Tenn. Crim.

-14-

App. 1998). No particular act need be shown, and the defendant need not have taken a physical part in the crime in order to be held criminally responsible. See id. To be criminally responsible for the acts of another, the defendant must "in some way associate himself with the venture, act with knowledge that an offense is to be committed, and share in the criminal intent of the principal in the first degree." State v. Mamey, 898 S.W.2d 756, 757 (Tenn. Crim. App.1994) (quoting Hombre v. State, 546 S.W.2d 235, 239 (Tenn. Crim. App.1976)) (internal quotations omitted).

Viewing the evidence in a light most favorable to the State, the proof established that the murder of Omar Stokes and Sid Towns was both premeditated and intentional and that the defendant knowingly participated in their murders. The defendant, Marcus Boyd, and Wardlow were drug dealers who gave money to Towns and Stokes to purchase drugs. When Towns and Stokes lost the money, the defendant and his partners were angry and agreed that Towns and Stokes were to be killed. The defendant initiated the planning stage of the murders by offering $10,000 to Randall Jackson to kill them. When Jackson refused to accept the defendant's offer, the defendant and his partners came up with another plan. The three of them agreed that Michael Brown and Calvin Boyd would kill Towns and Stokes at the auto body shop.

Proof also established that it was the defendant who threatened to kill Towns if he failed to bring Stokes with him to the auto-body shop. Moreover, it was the defendant who instructed Brown and Calvin Boyd to shoot Towns and Stokes when they saw the Lexus truck headlights flash. The defendant gave the signal by flashing the headlights, and Browns and Calvin Boyd shot and killed Towns and Stokes.

Additionally, the defendant's own statements implicated him as a knowing participant in the murders. In the planning stages, the defendant told one of the gunmen that he wanted him to "kill 'em, put 'em in the trunk, and take 'em to the expressway." The defendant further expressed his murderous intent saying, "Whack them. . . . Make sure don't nobody move. Make sure both of them dead." Later, after Towns and Stokes were killed, the defendant made the statements, "[w]e whacked them . . . . We killed them mother-fuckers. They got what they deserved. We whacked them. We're gonna hurt the town with this."

In this case, the jury heard all of the evidence, weighed the credibility of the witnesses, and found the defendant guilty of first degree murder. Moreover, the jury was properly instructed as to the elements of first degree murder, lessor included offenses, and the theory of criminal responsibility for the conduct of another. Consequently, we conclude that the evidence presented at trial was sufficient to support the defendant's convictions for first degree murder.

### III. Analysis: Sentencing

We now consider the defendant's argument that the trial court erred in ordering him to serve his life sentences consecutively.

Initially, we note that if a defendant is convicted of more than one criminal offense, a trial court may impose consecutive sentencing upon a determination by a preponderance of the evidence that one or more of the criteria set forth in Tennessee Code Annotated section 40-35-115(b) exists. Below is the statutory criteria relevant to this case.

> (1) The defendant is a professional criminal who has knowingly devoted such defendant's life to criminal acts as a major source of livelihood;
>
> (2) The defendant is an offender whose record of criminal activity is extensive;
>
> . . . .
>
> (4) The defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high;

Tenn. Code Ann. § 40-35-115. If the trial court concludes that the defendant is a dangerous offender under Tennessee Code Annotated section 40-35-115(b)(4), it must also find that the consecutive sentencing reasonably relates to the severity of the offense committed and is necessary to protect the public from further serious criminal conduct by the defendant. State v. Clifford Rogers, No. W2003-01375-CCA-R3-CD, 2004 WL 725281, at *5 (Tenn. Crim. App., at Jackson, April 1, 2004); State v. Imfeld, 70 S.W.3d 698, 708 (Tenn. 2002); State v. Wilkerson, 905 S.W.2d 933, 939 (Tenn. 1995). However, such specific factual findings are unnecessary for the other criteria listed in Tennessee Code Annotated section 40-35-115(b). State v. Lane, 3 S.W.3d 456, 461 (Tenn. 1999). Further, the statutory criteria set forth in Tennessee Code Annotated section 40-35-115 are stated in the alternative; therefore, only one need exist to support the appropriateness of consecutive sentencing.

In ordering the consecutive sentences, the trial court found that the defendant was a professional criminal, a dangerous offender, and had an extensive criminal history. Regarding the defendant's professional criminal status, the trial court found that the defendant was twenty-eight years old and had a ninth grade education. The defendant's employment information suggested that he only worked at temporary agencies. However, the defendant could not verify employment by identifying even one temporary agency. The defendant had an extensive criminal history consisting of theft, drug dealings, and robberies, "the types of offenses that one would commit if one needed money." The defendant's livelihood was provided through large, high-dollar drug sales that allowed the him to own two expensive vehicles.

The trial court also found the defendant to be a dangerous offender. The trial court articulated its findings stating:

> There are homicides and then there are homicides. There are some that in which the defendant's conduct is more revealing about his attitude and lack of

hesitation in killing the victims. And this case is a classic example of that. . . . [T]he proof was that [the defendant] flashed the lights in the vehicle and gave the signal to start the shooting, and that his conduct in the vehicle as they were driving over there, . . . and his statements and conduct when they drove to Nashville and . . . at that apartment in Nashville would all show that he was the type of individual who he didn't have to be dragged into this plan. He didn't have to be persuaded to participate in this. He didn't exhibit any sort of concern or fear or remorse after it happened.

. . . [His conduct indicated an individual who had absolutely no hesitation at all about committing this offense and was an active and willing and even anxious participant based on what the proof showed both before, during, and after these killings.

The trial court additionally found the defendant's record of criminal history to be extensive. According to the trial court, the presentence report indicated that the defendant had been arrested numerous times for misdemeanors, driving offenses, criminal trespass, thefts, drug cases, and robbery.

Based on our review, we conclude that the trial court did not err in imposing consecutive sentences. First, the presentence report, which the trial court relied upon, is not in the record before us. Without the presentence report, we have no way of reviewing the trial court's findings and must presume that its findings were correct. Second, the sentencing hearing transcript reveals that the trial court properly made factual findings relative to the statutory criteria set forth in Tennessee Code Annotated section 40-35-115(b). Therefore, the evidence in the record supports the trial court's determination that the defendant was a professional criminal, a dangerous offender, and had a record of extensive criminal history. Accordingly, the imposition of consecutive sentencing was appropriate.

### IV. Conclusion

Based on the foregoing review, the judgments of the trial court are affirmed.

_____
J.C. McLIN, JUDGE

-17-